IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 13, 2021 Session

## STATE OF TENNESSEE v. EDWARD G. JAMESON

**Appeal from the Circuit Court for Cheatham County**
**No. 18496    Larry Wallace, Judge**

_____

### No. M2020-00945-CCA-R3-CD

_____

The Defendant-Appellant, Edward G. Jameson, was convicted of three counts of statutory rape by an authority figure and eight counts of incest. See §§ 39-13-532 (statutory rape by an authority figure); 39-15-302 (incest). The trial court classified the Defendant as a Range II offender and imposed a total effective sentence of fifty-four years. On appeal, the Defendant contends that 1) the evidence is insufficient to sustain his convictions in Counts One through Four; 2) the indictments for Counts One, Three, Seven, and Ten are barred by the statute of limitations; 3) the State failed to elect a specific offense in Count Ten; 4) the trial court committed plain error in sentencing him as a Range II offender; and 5) the trial court erred in imposing consecutive sentences. Upon our review, we affirm the convictions and sentences in Counts Five, Six, Eleven, Twelve, and Thirteen, and we reverse and vacate Counts One, Two, Three, Four, Seven, and Ten and dismiss those indictments. We finally remand to the trial court for proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part, Reversed and Vacated in Part, and Remanded**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and JAMES CURWOOD WITT, JR., J., joined.

William B. Lockert III, District Public Defender, and Brennan M. Wingerter, Assistant Public Defender, for the Defendant-Appellant, Edward G. Jameson.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley and Benjamin A. Ball, Senior Assistant Attorneys General; Ray Crouch, District Attorney General; and Margaret F. Sagi and David D. Wyatt, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

On January 3, 2017, the Cheatham County Grand Jury returned a thirteen-count indictment against the Defendant, charging him with three counts of statutory rape by an authority figure and ten counts of incest, occurring between June 20, 2006 and July 1, 2015. A superseding presentment was returned on March 5, 2018. The offenses were alleged to have been committed against the Defendant's daughter, who was born on December 10, 1990.

At the April 11-12, 2018 trial, the victim testified that she was born on December 10, 1990, and that she was the Defendant's biological daughter. The victim testified that she had "always had limited sight" and had "four brain surgeries" due to hydrocephalus.[1] She stated that she had a visible shunt that "runs from [her] head to [her] stomach." The victim dropped out of high school after the first semester of her freshman year but ultimately obtained her GED. She testified that she was unable to see to drive and relied on others for transportation. The victim lived with her mother and her mother's husband, whom she believed to be her biological father, until she was four years old. [II, 21]. She then lived solely with her mother's husband and four of her siblings. In 2000 or 2001, the victim learned that the Defendant was her biological father. She wanted to "get to know . . . [her] real dad[,]" and she began writing letters to the Defendant in April 2005.

The victim testified that she first met the Defendant in August 2005 at his mother's house. She explained that there were two houses on the property; the Defendant's mother's house and the "block house[.]" When the victim first met the Defendant, she would visit him "for a day on the weekend," and she later began visiting him for the entire weekend. The Defendant acknowledged that he was her biological father, and the victim "believe[d] him to be" her biological father. The victim stated that when she first began visiting the Defendant, they would go fishing, go camping, and go out to eat. When the victim spent the night with the Defendant, she would sleep in the same bed as him at his mother's house. The victim testified that the first sexual encounter with the Defendant occurred in October 2005, when the Defendant "started to rub on [her] boobs" and vagina while she was wearing a nightgown. The Defendant made her "promise that [she] would never tell and that [they] would take it to [their] grave." The victim stated that the encounter made her feel "scared." The victim testified that she and the Defendant "had sex" for the first time at "the end of 2005, the beginning of 2006" while they were at his mother's house. She stated that they would frequently "have sex" at first. She explained that by "sex," she meant "[o]ral penetration [and a]nal."

The victim explained that in 2006, she and the Defendant "had sex" frequently, and she remembered it occurring at the Defendant's mother's house or at the "block house." She also recalled it occurring in a graveyard "[o]ff of Little Marrowbone Road." The

---

[1] The victim's mother described hydrocephalus as "water on the brain" in her trial testimony.

victim stated the graveyard incident occurred in the Fall of 2006 when she was 15 years old. While in the graveyard, the Defendant informed her that she "was conceived there." The victim testified that when she was 16 years old, she remembered being in the Defendant's mother's kitchen with him at night, and "he sat down at the kitchen table chair and asked [her] to turn around and sit on him backwards." The Defendant's mother "ended up walking in" but "didn't catch [them.]" The victim affirmed that after she dropped out of high school, she moved into the "block house" with the Defendant. While there, they "had sex at least once a day."

The victim testified that in the Fall of 2008, the Defendant began dating a woman. After they starting dating, the Defendant and the victim had sex, but the Defendant then told the victim that they "couldn't do it anymore because he felt like he was cheating" on his girlfriend. The victim testified that "it stopped for about six months" after that. In 2009, the victim earned her GED. She stated that she was living with her mother at that time, but the Defendant would drive her to and from her GED classes. The Defendant came to her GED graduation, and "afterwards, he took [her] out to eat," and they "had sex behind a barn on [her] mother's road" in a car. The victim testified that in 2013, she was living with the Defendant and worked for a company called "Homemax." She stated that in February 2013, three days before she was fired from Homemax, she and the Defendant had sex at his mother's house. In 2014 when she was 23 years old, she and the Defendant both worked for a company called "Martinrea." The victim explained that they worked the same shift, and she "[f]elt like [she] was being controlled" while they worked together.

The victim testified that she learned that the Defendant had "a mole on his right inner thigh" during "sexual involvement with him[.]" She stated that the mole was "close to his private area[.]" A photograph of the Defendant's thigh mole was received as an exhibit. The victim explained that she saw the mole when she "went to give him oral sex[,]" and a year before she reported the abuse, she "found that on his leg one day and decided that [she] would have something that [she] would be able to identify that others wouldn't[.]" The victim testified that she also noticed that the Defendant was circumcised, and she stated that the Defendant would use a "cock ring" so that "he could have an erection." She again lived with the Defendant in 2013, 2014, and 2015, and she stated that they had sex for the last time in June 2015 in the Defendant's mother's bedroom.

The victim testified that she did not report the abuse earlier because she "wanted [the Defendant] in her life as [her] dad, and if [she] told, then that wouldn't happen anymore." She stated that she "wanted a father-daughter relationship." The victim reported the abuse when she was 24 years old to her mother, Joyce Alverson, and her friend, Andre. She explained that she finally reported the abuse because she "wanted the sexual part to stop," and she "mentally could not hold it in anymore." The victim and her mother "went and filed charges" against the Defendant the same day. The victim affirmed that all

of the sexual encounters she had described occurred in Cheatham County. She stated that the Defendant never wore a condom when they had sex, but he "pulled out" and did not "ejaculate inside of [her.]"

On cross-examination, the victim testified that prior to turning 18, she lived with the Defendant for a year in 2008. She stated that she and the Defendant would have sex "maybe two, three times a day" during the beginning of the abuse. She agreed that he never wore a condom, and she never had "any pregnancy scares." The victim testified that she worked with Andre and the Defendant at Martinrea, and the Defendant became angry when he saw Andre "smack[ her] on the butt." The victim agreed that when she was 18, she and the Defendant had a "falling out" when she went to visit a man she met on the internet at a hotel. She disagreed that she made the sexual abuse allegations against the Defendant because she was "upset with" him or because she wanted to move back into her mother's house.

On redirect examination, the victim reiterated that she did not disclose the abuse until she was 24 years old, not when she was 18. She stated that she did not "like to be around anyone" as a result of the abuse. The victim explained that she risked losing "having [the Defendant] as a dad" by disclosing the abuse, which was something that was "important" to her.

Joyce Alverson, the victim's mother, testified that the victim was declared legally blind as a minor. She agreed that the victim lived with her and her step-father until he and Alverson divorced. The victim then lived with her step-father, who eventually told the victim that the Defendant was her biological father. The victim worked with her mother cleaning houses at some point but "couldn't see to dust things." Alverson stated that she helped the victim contact the Defendant, and the victim and the Defendant met for the first time at her house. She testified that the Defendant introduced the victim as his daughter to his family and did not question whether he was her father. Alverson stated that in 2015, the victim disclosed the sexual abuse to her, which made her "very upset." They went to law enforcement the same day and spoke with Detective Kenneth Miller.

On cross-examination, Alverson stated that she confirmed to the victim that she was "conceived in a graveyard." She agreed that the Defendant would accompany the victim to family holidays, though he would sometimes come "without being invited." On redirect examination, Alverson clarified that she only verified to the victim that she was "conceived in a graveyard" but did not provide that information.

Tricsta Adams testified that she was the victim's half-sister, and they shared the same mother. She stated that in 2012 she had seen the Defendant and the victim "in a sleeping arrangement" in the Defendant's mother's bedroom. She elaborated that she saw

them "sleeping in the same bed together" and "[s]nuggling underneath the covers together, both heads at the same end of the bed." Adams testified that seeing the Defendant and the victim in bed together "seemed weird, but [the victim] didn't say anything about it," so Adams "just let it go." She "would spend almost every weekend" at the Defendant's mother's home when she was younger, and she chose to sleep on the couch, though she was "invited [by the Defendant] to sleep in bed" with him and the victim. Adams stated that the Defendant seemed "very possessive" of the victim when he was away from her.

On cross-examination, Adams disagreed that the Defendant was possessive in a father-like manner because of the victim's meeting a man at a hotel on one occasion. She compared the Defendant's possessiveness to that of a husband On redirect examination, Adams testified that the relationship between the Defendant and the victim appeared to be more like that of a "married couple" than that of a father and daughter.

Detective Kenneth Miller testified that he was an investigator with the Cheatham County Sheriff's Office. He stated that in July 2015, he first met with the victim and Alverson. He explained that they were sent to his division when the victim alleged that "she had been sexually assaulted for an extended period of time by her father." Detective Miller stated that he was the person who had taken the previously-admitted photographs of the Defendant's thigh mole. He affirmed that in order to see and photograph the mole, the Defendant had to "pull[ his genitalia] back to the side[.]" Detective Wyatt also affirmed that the Defendant was circumcised.

On cross-examination, Detective Miller testified that the Defendant was cooperative and denied all of the abuse allegations when he interviewed him. He stated that the Defendant told him that the victim knew about his thigh mole because "he was wearing a particular style of underwear that was irritating and chafing it[,]" and the victim walked in the room while he was "checking it out[,]" and the Defendant "may have possibly complained about it that day." On redirect examination, Detective Miller reiterated that the victim told him she knew about the thigh mole because she was in "close proximity" to it.

At the close of its case-in-chief, the State made the following election of offenses:[2]

---

[2] The trial court dismissed Counts 8 and 9 for insufficient evidence and instructed the jury that those counts had been "removed from [its] consideration."

- 5 -

| Count | Event |
|---|---|
| 1 (statutory rape by an authority figure)<br><br>2 (incest) | When "the victim and the [D]efendant had sexual intercourse in a graveyard . . . . [and] the [D]efendant told her she was conceived in a graveyard."<br><br>Between June 20, 2006, and December 31, 2006. |
| 3 (statutory rape by an authority figure)<br><br>4 (incest) | When the victim "and the [D]efendant had sex on a kitchen chair at [her] grandmother's house[.]"<br><br>Between January 1, 2007, and December 31, 2007. |
| 5 (statutory rape by an authority figure)<br><br>6 (incest) | When the Defendant "had gotten a new girlfriend and the [D]efendant and the victim had sex at the block house and he told her that he believed that they couldn't do this anymore because he felt that he was cheating on his girlfriend[.]"<br><br>Between January 1, 2008, and December 31, 2008. |
| 7 (incest) | "[W]hen [the victim] graduated with her GED, the [D]efendant took her out to dinner and had sex with her on her mother's road in Cheatham County in [his girlfriend's] car."<br><br>Between January 1, 2009, and December 31, 2009. |
| 8 (incest) | "[The victim] testified that she had sex multiple times with [the Defendant]."<br><br>Between January 1, 2010, and December 31, 2010. |
| 9 (incest) | "[The victim] testified that she had sex multiple times with [the Defendant]."<br><br>Between January 1, 2011, and December 31, 2011. |
| 10 (incest) | The victim "was working at Homemax factory and . . . she had sex with the [D]efendant in Cheatham County . . . during that time period."  [III, 7-8].<br><br>Between January 1, 2012, and December 31, 2012. |
| 11 (incest) | "[I]n 2013, three days before [the victim] was fired from Homemax, she was living with [the Defendant,] and she had sex with him at the block house."  [III, 8].<br><br>Between January 1, 2013, and December 31, 2013. |
| 12 (incest) | When the victim was "working at Martinrea . . . the [D]efendant and the victim had sex at the [D]efendant's mother's house and [the victim] was performing oral sex on him . . . that's when she noticed the skin tag." [III, 8].<br><br>Between January 1, 2014, and December 31, 2014. |
| 13 (incest) | In the "beginning of June 2015[,] they had sex at the grandmother's house in Cheatham County."  [III, 8].<br><br>Between January 1, 2015, and December 31, 2015. |

The Defendant elected not to testify on his own behalf. Following the close of all proof, the jury convicted the Defendant as charged in the presentment, with the exception of Counts 8 and 9. At the sentencing hearing, the victim testified that she had "[a]nger, anxiety, depression, and regret and a void that no one will ever be able to fill" as a result of the abuse. She further stated that the abuse caused her to have suicidal ideations. The victim's mother testified that the victim had become "[v]ery withdrawn" and had "trust issues" and was "[a]lways scared" as a result of the abuse. She affirmed that the victim was in counseling. Ultimately, the trial court sentenced the Defendant as a Range II offender to ten years each in Counts One, Three, and Five, the statutory rape by an authority figure counts, and to eight years each in Counts Two, Four, Six, Seven, Ten, Eleven, Twelve, and Thirteen, the incest counts. The trial court ordered the sentences in Counts One through Six to run consecutively and the remaining counts to run concurrently with Count 1, for a total effective sentence of fifty-four years. The Defendant was also ordered to be placed on the sex offender registry and to receive community supervision for life following the expiration of his sentence. The Defendant filed a motion for new trial on April 4, 2019, and an amended motion for new trial on February 25, 2020. The trial court denied the motion by written order on June 12, 2020.

**I. Sufficiency of the Evidence.** The Defendant challenges the sufficiency of the evidence in Counts One through Four, specifically asserting that the State "failed to prove that there was any intrusion of [the victim]'s body" regarding these counts. Because we reverse and vacate the convictions in Counts One and Three in the following section as barred by the statute of limitations, we only address the sufficiency of the evidence in Counts Two and Four, which are both convictions for incest. In response, the State contends that the victim "provided testimony such that the jury could reasonably infer that penetration occurred." We agree with the Defendant and reverse and vacate his incest convictions in Counts Two and Four.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that

evidence.  State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two.  State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); Hall, 976 S.W.2d at 140.  The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'"  State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275).  The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence.  State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)).  Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.  Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)).  When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury."  Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

A person commits incest "who engages in sexual penetration with a person, knowing the person to be, without regard to legitimacy, the person's natural child."  Tenn. Code Ann. § 39-15-302(a)(1).  Sexual penetration is relevantly "sexual intercourse, . . . fellatio, [or] anal intercourse, or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's, the defendant's, or any other person's body[.]"  Tenn. Code Ann. § 39-13-501(7).

"The occurrence of penetration, even though penetration is statutorily defined, is a question of fact.  Thus, if the evidence is such that any rational trier of fact could have found penetration beyond a reasonable doubt, the evidence must be deemed sufficient."  State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001).  "[T]he testimony of a victim, by itself, is sufficient to support a conviction."  State v. Nance, 393 S.W.3d 212, 231 (Tenn. Crim. App. 2012) (citing State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)).  The State need not present "physical" evidence of penetration to establish its occurrence.  See generally State v. Tommie Phillips, No. W2012-01126-CCA-R3-CD, 2013 WL 6529308, at *1 (Tenn. Crim. App. Dec. 13, 2013), perm. app. denied (Tenn. Mar. 25, 2014).  Penetration may be established by circumstantial evidence.  See generally State v. Edward William Crandall, No. E2012-00338-CCA-R3-CD, 2013 WL 11876277, at *1 (Tenn. Crim. App. Mar. 21, 2013).  In order to prove penetration, the victim "does not have to use specific words[.]"  State v. Lance, No. 03C01-9804-CR-00136, 1999 WL 301457, at *5 (Tenn. Crim. App. May 14, 1999), perm. app. denied (Tenn. Nov. 22, 1999).

It is undisputed that the victim in the instant case is the Defendant's biological daughter. With respect to Count Two, the victim specifically gave the following testimony:

> [State]: Now, did this – to be very specific, what kind of sex was he having with you?
> [Victim]: Oral penetration. Anal.
> [State]: Was he performing these things on you? Were you performing these things on him?
> [Victim]: Both.
> [State]: And did that continue?
> [Victim]: Yes.
> [State]: How frequently in 2006 would you say this happened?
> [Victim]: Very frequently. I mean, it was often.
> [State]: Do you remember any specific places that he had sex with you?
> [Victim]: His mom's or the block house.
> [State]: Do you remember anything else in any parks or public areas?
> [Victim]: A graveyard.
> . . . .
> [State]: Now you said you had sex in the graveyard. Is there anything specific that he said to you about being in the graveyard?
> [Victim]: That I was conceived there.

The Defendant contends that because the victim never explicitly stated that she and the Defendant had sex in the graveyard, the evidence is insufficient to establish that penetration occurred, a requisite element of incest. The State urges us to utilize the "entirety of the victim's testimony" to establish that penetration occurred in the graveyard.

In our opinion, the foregoing testimony is inadequate to demonstrate that any form of penetration occurred in the graveyard. The "entirety of the victim's testimony" clearly establishes that she and the Defendant engaged in a sexual relationship over a period of years. However, as noted by the Defendant, only the prosecutor ever gave any indication of what occurred in the graveyard, as demonstrated in the transcript excerpt above. The victim never confirmed, denied, or even commented on the State's subsequent assertion that the victim and the Defendant had sex in the graveyard. Without more than the prosecutor's comment, the proof is insufficient to establish beyond a reasonable doubt that the Defendant had penetration with the victim on this specific occasion. Accordingly, Count Two must be reversed and vacated.

With respect to Count Four, the following testimony was elicited at trial regarding the incident in the kitchen:

[State]: Has anybody ever walked in on you all?
[Victim]: His mother, once.
[State]: And can you tell us about that?
[Victim]: We were in her kitchen, and he sat down at the kitchen table chair and asked me to turn around and sit on him backwards. And I'm not sure how long it lasted, but his mom – we heard a noise[,] and his mom ended up walking in. She didn't catch us, though. I mean to my knowledge, she didn't.
[State]: Did he do anything – did he act any way when she came in?
[Victim]: He was looking out the window when she came in there and said that he'd thought that maybe her brother . . . had fell, or whatever, and he was going to go check[,] and he went over there and checked and came back.
[State]: Was it nighttime?
[Victim]: Yes.

The Defendant contends, and we agree, that there is no indication that penetration ever occurred in the kitchen; the victim only specifically testified that she sat on the Defendant's lap. The State responds that "the totality of the proof" established that the Defendant "was engaging in sexual penetration of the victim" in his mother's kitchen.

We again cannot conclude that any form of penetration occurred in the kitchen. The victim only stated that she sat in the Defendant's lap while he sat in a kitchen chair. There was no evidence indicating that any form of penetration occurred. Without more evidence, the proof is insufficient to establish beyond a reasonable doubt that the Defendant had penetration with the victim on this specific occasion. Accordingly, Count Four must also be reversed and vacated.

**II. Statute of Limitations.** The Defendant asserts that the convictions in Counts One, Three, Seven, and Ten should be reversed and vacated because the State failed to commence prosecution within the applicable statute of limitations, and the Defendant did not affirmatively waive his statute of limitations defense. The State concedes that Counts One, Three, Seven, and Ten were brought beyond the applicable statute of limitations and should be dismissed. We agree.

Incest is a Class C felony, and statutory rape by an authority figure was also a Class C felony when the offenses in the instant case occurred.[3] See Tenn. Code Ann. §§ 39-13-532 (2006) (statutory rape by an authority figure); 39-15-302 (incest). Tennessee Code Annotated section 40-2-101(b)(3) provides that prosecution "shall begin within . . . [f]our

---

[3] We note that statutory rape by an authority figure became a Class B felony in 2016. Tenn. Code Ann. § 39-16-532 (2016).

- 10 -

(4) years for a Class C" felony[.]" Section 40-2-101(h)(1) provides an extended statute of limitations for incest of twenty-five years from the date the child turns eighteen years old for crimes committed on or after June 20, 2006. Section 40-2-101(i)(1) also provides an extended statute of limitations for statutory rape by authority figure of twenty-five years from the date the child turns eighteen years old for crimes committed on or after July 1, 2007. In this context, the Legislature has specifically tied the initiation of proceedings for sexual offenses against children to the time that the victim reaches adulthood. See State v. Charles Beaty, No. W2015-00223-CCA-R3-CD, 2016 WL 4400399, at *7 (Tenn. Crim. App. Aug. 16, 2016). Tennessee Code Annotated section 39-11-201(f) provides the appropriate burden of proof for the issue of whether a prosecution was timely commenced. Under the statute, "time limitations need be proven only in cases where those issues are raised by the defendant" and once raised, "the state must prove ... timely prosecution by a preponderance of the evidence." Tenn. Code Ann. § 39-11-201(f), Sentencing Comm'n Cmts.

In the instant case, Count One, statutory rape by an authority figure, occurred between June 20, 2006, and December 31, 2006, as alleged by the State. Therefore, prosecution for Count One had to begin by December 31, 2010, within four years of the offense date. We accordingly reverse and vacate the conviction in Count One because it is barred by the statute of limitations.

Count Three, statutory rape by an authority figure, occurred between January 1, 2007, and December 31, 2007, as alleged by the State. The State did not prove beyond a preponderance of the evidence that the offense occurred on or after July 1, 2007. Therefore, the extended time frame for prosecution provided by Tennessee Code Annotated section 40-2-101(i)(1) is inapplicable, and prosecution had to begin by December 31, 2011, within four years of the offense date. We accordingly reverse and vacate the conviction in Count Three because it is barred by the statute of limitations.

The victim was born on December 10, 1990, and turned 18 years old on December 10, 2008. Counts Seven and Ten, incest, occurred between January 1, 2009, and December 31, 2009, and January 1, 2012, and December 31, 2012, respectively, as alleged by the State. Because the victim had reached adulthood when Counts 7 and 10 occurred, the extended statute of limitations provided by Tennessee Code Annotated section 40-2-101(h)(1) is inapplicable, and prosecution had to begin by December 31, 2013, and December 31, 2016, respectively, within four years of the offense dates. We accordingly reverse and vacate the convictions in Counts Seven and Ten because they are barred by the statute of limitations.

**III. Election of Offenses.** The Defendant next argues that he was "deprived of his right to a unanimous jury verdict as to Count Ten due to the State's failure to properly elect a specific offense for that charge." We agree with the State that this issue is moot.

Mootness is a doctrine utilized by courts to determine the justiciability of a controversy. McIntyre v. Traughber, 884 S.W.2d 134, 137 (Tenn. Ct. App. 1994). "Cases must be justiciable not only when they are first filed but must also remain justiciable throughout the entire course of the litigation, including the appeal." Id. (citations omitted) An issue is not justiciable when it lacks "a genuine and existing controversy requiring the present adjudication of present rights." Id. (citing State ex rel. Lewis v. State, 347 S.W.2d 47, 48 (Tenn. 1961); Dockery v. Dockery, 559 S.W.2d 952, 954 (Tenn. Ct. App. 1977)).

> A moot case is one that has lost its justiciability either by court decision, acts of the parties, or some other reason occurring after commencement of the case. A case will be considered moot if it no longer serves as a means to provide some sort of judicial relief to the prevailing party.

Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Cty., 301 S.W.3d 196, 204 (Tenn. 2009) (internal citations omitted).

Because we already reversed and vacated Count Ten in the preceding section, any challenge as to the election of offenses in Count Ten is moot. See State v. Rodgers, 235 S.W.3d 92, 97 (Tenn. 2007) (discussing the doctrine of mootness).

**IV. Range Classification.** The Defendant next contends that he was erroneously classified as a Range II offender. Because he agreed to being classified as a Range II offender at trial based on his previous out of state felony convictions, the Defendant concedes that our review is limited to plain error. Tenn. R. App. P. 36(a), (e). The State responds that he is not entitled to plain error relief, specifically noting that he apparently agreed to the classification for tactical purposes. We agree with the State.

Under the plain error doctrine, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing U.S. v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283. We evaluate the Defendant's claims of error with these principles in mind.

A multiple offender, for purposes of this case, is defined as a defendant who has two to four prior felony convictions "within the conviction class, a higher class, or within the next two (2) lower felony classes" as the conviction for which he is being sentenced. Tenn. Code Ann. § 40-35-106(a)(l). Prior convictions include convictions committed in another state that, if committed in this state, would have constituted a crime. Id. § 40-3-106(b)(5). "In the event that a felony from a jurisdiction other than Tennessee is not a named felony in this state, the elements of the offense shall be used by the Tennessee court to determine what classification the offense is given." Id. The original or a certified copy of the court record showing appellant's prior convictions is prima facie evidence of the defendant's prior felony record. Id. § 40-35-202(a).

The Defendant was convicted of statutory rape by an authority figure and incest, both Class C felonies. See Tenn. Code Ann. §§ 39-13-532 (2006) (statutory rape by an authority figure); 39-15-302 (incest). Therefore, to qualify as a Range II, multiple offender, the trial court had to find that the Defendant had at least two prior felony convictions that were a Class E or higher. Id. § 40-35-106(a)(1). In the State's notice alleging that the Defendant was a Range II offender, the State relied on his Kentucky conviction for flagrant nonsupport, a Class D felony, and his Missouri conviction for possession of a controlled substance, a Class C felony.

At the sentencing hearing, the Defendant's presentence report was received as an exhibit. Relevant to the Missouri conviction, it contained a "petition to enter plea of guilty," "docket entry – guilty plea," and "order granting shock probation." Relevant to the Kentucky conviction, the report contained a "judgment and sentence on plea of guilty." The State and the Defendant agreed multiple times that his out of state felony convictions qualified him as a Range II offender. Specifically, defense counsel stated, "Defense does not contest that he has two felonies that put him at Range II." The court reiterated the classification by asking the State and the Defendant if they agreed that the Defendant was a Range II offender, which they both answered in the affirmative. Further, in explaining its sentencing decision, the trial court stated, "[O]f course, the record and the parties are in agreement, too, that Range II is the appropriate range there[.]"

The Defendant apparently does not argue that flagrant nonsupport should not be considered a qualifying felony for purposes of his Range II classification. With respect to the Missouri conviction, we agree with the Defendant that we are unable to determine that it is comparable to the elements of any Tennessee felony statute without further development of the record. See Tenn. Code Ann. 40-35-106(b)(5). However, as noted by the State, we cannot conclude that this issue was not waived for tactical reasons. The Defendant's agreeing multiple times that his out of state convictions qualified him as a Range II offender prevented the State from further developing the circumstances surrounding the Missouri conviction and introducing additional proof. Such a decision could have been a tactical choice in order to prevent additional proof of that or other convictions being introduced during the sentencing hearing. Though the Defendant cites State v. Moats, No. E2019-02244-CCA-R3-CD, 2020 WL 6392483, at *5 (Tenn. Crim. App. Nov. 2, 2020), to support his assertion that no tactical reason existed for such waiver, the two cases are easily distinguishable. In Moats, the trial court applied the incorrect theft grading statute to that defendant, causing him to incur "additional felony convictions on his criminal record" and was sentenced to six years for his theft convictions, rather than eleven months, 29 days. Id. In short, the Defendant in Moats had no way to benefit from withholding an objection or waiving the issue. The Defendant does not provide any other reasoning for his waiver of the issue or agreeing that he was a Range II offender. In the instant case, it is conceivable that the Defendant did not object to his classification as a Range II offender at trial because he did not want the State conducting additional investigations into his convictions or presenting additional proof. Further, by failing to object to the classification, the Defendant created the exact issue he now asserts requires this court to order to remand his case for a new sentencing hearing. Because we cannot conclude that this issue was not waived for tactical reasons, the Defendant is not entitled to relief.

**V. Consecutive Sentencing.** Finally, the Defendant contends that the trial court erred in imposing partial consecutive sentencing. Specifically, the Defendant argues that he should be granted a new sentencing hearing because the trial court did not consider the requisite sentencing principles and "never explained why a 54-year sentence was more appropriate than say 10 years or 18 years or even 36 years." The State responds that the "totality of the court's findings . . . shows that the court considered these principles when imposing partial consecutive sentencing." We agree with the State.

Where a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively. Tenn. Code Ann. § 40-35-115(a) (2006). The Tennessee Supreme Court has held, "[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to

consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013). "A trial court abuses its discretion if it 'applie[s] an incorrect legal standard or reache[s] a decision against logic or reasoning that cause[s] an injustice.'" State v. Harbison, 539 S.W.3d 149, 159 (Tenn. 2018) (quoting Dotson, 254 S.W.3d at 387-88). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of seven categories enumerated in code section 40-35-115(b). Those categories include:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b) (2006). An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102(1); see State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002). In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed." Tenn. Code Ann. § 40-35-103(2); see Imfeld, 70 S.W.3d at 708.

In determining to impose partial consecutive sentencing in the instant case, the trial court stated, in relevant part, as follows:

Then we get down to factor number (5), "the defendant is convicted of two or more statutory offenses involving sexual abuse of a minor with consideration of the aggravated circumstances arising from the relationship between the defendant and victim or victims. The time span of defendant's undetected sexual activity, the nature and scope of the sexual acts, and the extent of the residual, physical, and mental damage to the victim or victims." Sounds like a textbook factor for this case, in my mind, based on the evidence at trial and at sentencing.

As far as the other factors, they probably wouldn't apply, except for number (5).

. . . . .

Okay. So the court finds factor (5) does apply in consecutive sentencing for a number of the counts. Some of the counts, of course, occurred after [the victim] was the age of majority. I'll go over that too. But just to kind of give a little more detail in this case, of course. There was testimony, of course, about her special needs, basically the legally blind, special education. I already mentioned the Court felt – believes that the [D]efendant preyed upon her, the victim, even during the time it was going on [she] was exhibiting issues – negative issues because of what was happening, based on what the Court remembers from the testimony at trial too.

I guess what I was trying to say is that the victim was experiencing mental – or trauma during the time the events happened and afterwards, too, which has been testified to by the victim and the mother now. That [the victim]'s been negatively impacted greatly. Her behavior is a lot different. She's withdrawn. The time of this, of course, occurred almost – well, for approximately nine to ten years. So it was over a length of time.

And of course, again, she went to the [D]efendant – the victim went to the [D]efendant because she wanted to meet her father and wanted to have a father, and he took complete advantage of that and basically manipulated her into thinking that this was a proper thing somehow, to have sex with her daddy. So I put a hundred percent blame on him with regards to that for sure.

- 16 -

And of course, the time span, we talked about that. The nature and scope of sexual acts, that was testified [to] at trial, the variety and other things. And, of course, the damage to the victim. So again, factor (5) applies by more than a preponderance of the evidence, probably beyond a reasonable doubt really.

The trial court ultimately ordered the sentences in Counts One, Two, Three, Four, Five, and Six to run consecutively to each other. Because we have already reversed and vacated Counts One, Two, Three, and Four, we will only address the consecutive sentencing relevant to Counts Five and Six.

Our review of the record indicates that the trial court did not abuse its discretion in imposing partial consecutive sentencing. The trial court made extensive findings at the sentencing hearing, including thoroughly examining enhancement and mitigating factors and the appropriateness of alternative sentencing. Despite the Defendant's assertion that the trial court did not consider whether the imposed consecutive sentence was "'no greater than that deserved for the offense committed'" and the "least severe measure necessary to achieve the purposes for which the sentence is imposed," the record reveals otherwise. The trial court explicitly discussed that the Defendant had a lack of potential for rehabilitation and the "horrifying" nature of the offenses. Further, as outlined above, the trial court discussed that the Defendant was the victim's father, the lengthy time period during which the abuse occurred, and the testimony from both the victim and her mother that the abuse had negatively impacted the victim. The Defendant has not established an abuse of discretion, and he is not entitled to relief.

## CONCLUSION

The convictions in Counts One, Two, Three, Four, Seven, and Ten are reversed and vacated. Because we have reversed Counts Three and Four, we remand for entry of corrected judgment forms in Counts Five and Six to reflect that they no longer run consecutively to Counts Three and Four and instead run consecutively to each other, and corrected judgment forms in Counts Eleven, Twelve, and Thirteen to reflect that they no longer run concurrently to Count 1. The judgments in Counts Five, Six, Eleven, Twelve, and Thirteen are otherwise affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE